**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

DELTA HEALTH GROUP, INC.,
A Delaware Corporation for Profit,

       Plaintiff,

v.                                   Case No.: 3:05-CV-436/RV/EMT

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, and
MIKE LEAVITT, in his official capacity as
SECRETARY of the UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

       Defendants.
_____/

## ORDER

      This litigation arises under the Medicare program. Plaintiff, Delta Health Group,
Inc., has filed a 30-page Complaint (with 65 pages of exhibits) against Defendants, the
United States Department of Health and Human Services and Secretary of the agency,
Mike Leavitt. Pending before this Court is Defendants' 18-page motion to dismiss the
Complaint (with 51 pages of exhibits) (Doc.25), and Plaintiff's 23-page memorandum
in opposition thereto (with 40 pages of exhibits). Also pending is Plaintiff's request for
oral argument (Doc. 30), in which Plaintiff has suggested that oral argument may help
the Court in deciding the novel and complex issues raised in these voluminous papers.

Case No.: 3:05-CV-436/RV/EMT

I.     **APPLICABLE LAW**

A. Motion to Dismiss Standard

A motion to dismiss cannot be granted unless the complaint alleges no set of facts which, if proved, would entitle the plaintiff to relief. E.g., Blackston v. Alabama, 30 F.3d 117, 120 (11th Cir. 1994). On a motion to dismiss, the facts as stated in the complaint and all reasonable inferences therefrom must be taken as true. Stephens v. Dep't of Health and Human Services, 901 F.2d 1571, 1573 (11th Cir. 1990); accord Cruz v. Beto, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972); Hunnings v. Texaco, Inc., 29 F.3d 1480, 1484 (11th Cir. 1994). In deciding a motion to dismiss, the district court is limited to a review of the allegations as set forth in the complaint, as well as to any attached or incorporated documents that are central to the plaintiff's claim. Brooks v. Blue Cross & Blue Shield of Florida, 116 F.3d 1364, 1369 (11th Cir. 1997). The court may also properly consider documents of which it may take judicial notice, without converting a motion to dismiss into a motion for summary judgment. See generally Fed. R. Evid. 201; Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1280 (11th Cir. 1999) (in deciding a motion to dismiss the court will primarily consider the allegations in and documents attached to/incorporated into the complaint, "'although matters of public record … may be taken into account'" as well) (quoting 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (2d ed. 1990)).

B. The Medicare Program

Medicare is a federally-subsidized health insurance program for the elderly and certain disabled persons. See generally 42 U.S.C. §§ 1395 et seq. ("Medicare Act" or "Medicare program"); see also United States ex rel. Sarasola v. Aetna Life Ins. Co., 319 F.3d 1292, 1293 (11th Cir. 2003). The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), previously known as the Health Care Financing Administration ("HCFA"), which is a component of the United States

Department of Health and Human Services ("HHS").[1]

The Medicare Act is comprised of two principal parts, Part A and Part B. See generally 42 U.S.C. §§ 1395c to 1395i-4 (Part A); and 1395j to 1395w-4 (Part B). Medicare Act Part A, at the center of this controversy, provides coverage to qualified beneficiaries for hospital and post-hospital services, including skilled nursing care. See id.; see also Sarasola, supra, 319 F.3d at 1293.

To participate in the Medicare program, and be reimbursed for providing nursing care to Medicare beneficiaries, a skilled nursing facility ("SNF") must enter into and file a "provider agreement" with the Secretary of HHS. See 42 U.S.C. § 1395cc(a); see also Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 120 S. Ct. 1084, 146 L. Ed. 2d 1 (2000); Sarasola, supra, 319 F.3d at 1293. The provider agreement, at bottom, acts as a contract with the federal government in which the provider agrees to furnish quality nursing services to Medicare beneficiaries in compliance with all the applicable federal and state regulations. To ensure that the SNF is capable of meeting its obligations under the contract, the provider must first go through a comprehensive certification process to confirm that it meets statutory standards vis-a-vis beneficiary health, safety, and care. See 42 U.S.C. §§ 1395i-3(a) to (d), 1395cc(b)(2); see also 42 C.F.R. §§ 489.10, 489.12 (setting forth the conditions for accepting and grounds for denying provider agreements); BP Care, Inc. v. Thompson, 337 F. Supp. 2d 1021, 1023 (S.D. Ohio 2003), aff'd on other grounds, 398 F.3d 503 (6th Cir. 2005). Once the initial certification is complete and the SNF is approved, the provider will be given a "provider number." See In re Raintree Healthcare Corp., 431 F.3d 685, 687 (9th Cir. 2005). The provider will then be reimbursed directly for services provided to Medicare

---

[1]As seen immediately above, and will be further seen infra, this area of the law is rife with acronyms. This shorthand --- an unfortunate staple of Medicare decisions --- is intended to assist, and hopefully will not hinder, the discussion that follows.

patients. Sarasola, *supra*, 319 F.3d at 1293.

The would-be owner of a provider agreement may avoid the initial certification process, which can be quite lengthy, if it is "assigned" an existing provider agreement. This may be done, for example, if there is a "change of ownership," as defined in the regulations, see generally 42 C.F.R. § 489.18, and the new owner wants to avoid a break in service or lapse in coverage. See United States v. Vernon Home Health, Inc., 21 F.3d 693 (5th Cir.), *cert. denied*, 513 U.S. 1015, 115 S. Ct. 575, 130 L. Ed. 2d 491 (1994).[2] In such a situation, the new owner will assume the provider agreement, which is then "automatically . . . assigned to the new owner." 42 C.F.R. § 489.18(c). Notably, the "assigned agreement is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued." See id. at § 489.18(d). If the new owner does not want to be subject to the terms and conditions of the already-existing provider agreement, it must refuse the assignment, go through the initial certification process, enter into a new provider agreement, and, if authorized, obtain a new provider number. See Vernon Home Health, Inc., *supra*, 21 F.3d at 696. Unless and until the certification is complete, the provider will be unable to participate in the Medicare program, thus disrupting Medicare coverage and payment for services. See id.; see also Raintreee Healthcare Corp., *supra*, 431 F.3d at 687 ("When RainTree transferred operation of the nursing home facility to Suncrest, Suncrest accepted the automatic assignment of that provider number by operation of law. If Suncrest instead

---

[2]For a general discussion on the reasons for and consequences of assuming an existing provider agreement after change of ownership, see L. Robert Guenthner, *The Elephant in the Conference Room: Transactions with Entities Under Investigation*, 16 Health Law 1 (2004); Catherine E. Groves, *Medicare Provider Liability Following the Sale of Assets or Stock of a Provider Operating Under Chapter 11*, 14 Health Law 15 (2002); Sarah Robinson Borders, Rebecca Cole Moore, *Purchasing Medicare Provider Agreements in Bankruptcy: The Case Against Successor Liability for Prepetition Overpayments*, 24 Cal. Bankr. J. 253 (1998).

had chosen to apply for a new number, the nursing home could not have participated in the Medicare program while its application was pending."); BP Care, Inc., 337 F. Supp. 2d at 1029 (new owner may avoid liability under existing agreement by entering into a new agreement; "[t]his would require a new application process, however, and the continuous operation of the nursing home during the change in ownership might be disturbed while the new operator awaited certification"). As the phrase implies, a "change of ownership" only means the *owner* of the provider agreement has changed; the actual *provider* itself remains the same.

       After becoming certified, or assuming an already-existing provider agreement, the provider must comply with myriad statutory and regulatory requirements. See, e.g., Illinois Council, *supra*, 529 U.S. at 6. State and federal agencies enforce these requirements via periodic inspections. Id. The inspectors will report any violations, or "deficiencies," discovered during the inspections and these deficiencies, in turn, may lead to the imposition of sanctions, or "remedies." Id. Congress has authorized a host of different remedies for deficiencies uncovered during survey inspections, and these sanctions may run the spectrum from a civil money penalty ("CMP") for less serious violations, to the termination of a provider agreement in more serious cases. See 42 U.S.C. § 1395i-3(h); see also Illinois Council, *supra*, 529 U.S. at 6-8. After being cited by CMS, the provider must fix the deficiencies and return to "substantial compliance" under the Medicare regulations. To that end, the provider must file a plan of correction ("POC") for approval by CMS or the state surveying agency. 42 C.F.R. § 488.402(d). CMS is not, however, required to accept an unverified statement or claim as to when compliance is accomplished. See 42 C.F.R. § 488.440(h). Thus, upon submission of the POC, the surveying agency is ordinarily required to revisit the facility to determine if the facility is, in fact, compliant. See Vencor Nursing Centers, L.P. v. Shalala, 63 F. Supp. 2d 1, 10 (D.D.C. 1999) (noting that under HHS procedure, an onsite resurvey

is "generally required" and "almost always necessary" after the POC is submitted); see also 42 C.F.R. § 488.110(l). If the facility believes it achieved substantial compliance during the gap of time between the date of the POC and the resurvey, and it wants to avoid liability for that interim period, it must submit "written credible evidence" that compliance was achieved before the resurvey. See 42 C.F.R. § 488.440(h).

Prior to imposing a CMP, such as the one at issue here, CMS must provide the facility with a written notice of the penalty. See 42 C.F.R. § 488.434(a). The notice must include, *inter alia*, a description of the alleged noncompliance, the statutory basis for the penalty, the amount and nature of the penalty, and instructions for responding to the notice letter, including a statement of the provider's right to a hearing before an Administrative Law Judge ("ALJ"). See id. If the provider affirmatively waives its right to the hearing, CMS will reduce the penalty by 35%. See 42 C.F.R. § 488.436. If the provider wants a hearing, one must be requested within 60 days from receipt of the CMP notice. See 42 C.F.R. § 498.40. If a hearing is requested, the provider will be given an opportunity to appear before the ALJ, to be represented by counsel, to call witnesses, and to present evidence. See 42 U.S.C. § 1320a-7a(c)(2); 42 C.F.R. §§ 498.40 - 498.78. Any party dissatisfied with the ALJ's decision may request further administrative review by HHS's Departmental Appeals Board ("DAB"). See 42 C.F.R. § 498.82. The DAB ruling will constitute HHS's final administrative decision. See 42 C.F.R. § 498.88(c).

A provider "adversely affected" by a final administrative decision regarding the imposition of a CMP may procure judicial review by filing a petition in the appropriate court of appeals within 60 days after receiving a notice of the determination. See 42 U.S.C. § 1395i-3(h)(2)(B)(ii). Judicial review of the CMP decision is further subject to the limitation contained in 42 U.S.C. § 405(h), incorporated into the Medicare Act by 42 U.S.C. § 1395ii, which provides "[n]o findings of fact or decision of [HHS] shall be

reviewed by any person, tribunal, or governmental agency except as herein provided," and "[n]o action against the United States, [HHS], or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter." See 42 U.S.C. § 405(h); accord 42 U.S.C. § 1320a-7(f)(3) (applying section 405(h) to the provisions for reviewing CMP determinations pursuant to 42 U.S.C. § 1320a-7a).

If an SNF is charged with a CMP, the penalty will be payable on the applicable due date, which may vary depending, *inter alia*, on whether a hearing was requested. See 42 C.F.R. § 488.442(b). If the facility does not satisfy the CMP on the due date, "[t]he amount of the penalty, when determined, may be deducted from any sum then or later owing by CMS or the State to the facility." See 42 C.F.R. § 488.442(c).

## II.   BACKGROUND

### A. Facts

The following facts are taken from Plaintiff's Complaint and the attachments thereto and, as noted above, are assumed true for purposes of this Order.

In 1998, Health Care Properties III of South Florida, Inc. ("HCPIII") operated an SNF, which was then called North Miami Nursing and Rehabilitation Center ("North Miami"). See Amended Complaint (Doc. 21) ("Compl."), at ¶9. Skyler Miami, Inc. ("Skyler"), which is described in the Complaint as an affiliate of Plaintiff Delta Health Group, Inc. ("Delta"), owned the land where North Miami was located. See id. at ¶25. HCPIII owned Medicare Provider No. 10-5502 and was responsible under the relevant provider agreement. See id. at ¶9; see also Compl. Exs. 1, 2, 15. On or about July 1, 1998, HCPIII was acquired as a subsidiary by Integrated Health Services, Inc. ("IHS"). See Compl. at ¶10. Provider No. 10-5502 remained "exclusively vested" in HCPIII. Id. Even though Plaintiff's affiliate owned the property where North Miami was located, both HCPIII and IHS were unrelated to Plaintiff. Id. at ¶¶9-10, 25.

On August 26, 1998, a state Medicaid agency acting on behalf of CMS,[3] the Florida Agency for Health Care Administration ("AHCA"), inspected North Miami and found that the facility had failed to assure that a recently-deceased resident received proper renal dialysis treatment. See Compl. at ¶12. Based on this event, the AHCA survey found the facility was not in substantial compliance with Medicare standards and thus recommended that CMS impose a CMP of $10,000 per day --- the maximum fine allowable --- until the facility reached substantial compliance. Id. at ¶12. Nowhere in its Complaint does Plaintiff challenge the deficiency itself or the appropriateness of the CMP. See generally Compl.

On September 1, 1998, CMS wrote a letter to the North Miami administrator, requesting that the facility submit its POC to address the deficiencies described in the survey report. See Compl. at ¶13. The letter further indicated that CMS had decided to impose the CMP of $10,000 per day until substantial compliance was achieved. Id. As required under the regulations, the letter informed North Miami of the basis for the penalty and its right to a hearing before an ALJ. See generally Compl. Ex. 4. Shortly thereafter, on September 4, 1998, the administrator submitted a POC, indicating that all measures to prevent future deficiencies had been implemented by --- and thus there had been substantial compliance on --- September 3, 1998. See Compl. at ¶16.

As noted above, a provider found to be deficient must ordinarily be resurveyed before the violation is lifted. In this case, AHCA did not resurvey until September 20, 1998. See Compl. at ¶17. This follow-up inspection revealed that the deficiencies in the first survey had been remedied and no further corrective measures were required. Id. It appears from the record as developed thus far that AHCA accepted the POC as presented and did not make corrections or contrary findings. See id. North Miami was,

---

[3]To be accurate, CMS was still known as HCFA at this time. Nevertheless, for consistency and ease of reference, I will use CMS throughout this Order.

therefore, found to be in substantial compliance on September 20, 1998, the date of the resurvey. See Compl. Exs. 6B, 6C.

On April 9, 1999, AHCA issued a standard SNF license to HCPIII, effective from February 1, 1999, through January 31, 2000. See Compl. at ¶18; Compl. Ex. 7. This license expressly confirmed that HCPIII was compliant with the rules and regulations of health care administration in Florida and was licensed to operate North Miami. See Compl. Ex. 7. As required under Florida statute, see Fla. Stat. § 400.179(d), HCPIII as a leased facility posted a surety bond in the statutorily-required amount to assure that it could pay amounts owed. See Compl. at ¶18; see also Compl. Ex. 8.

CMS could have elected to enforce the CMP by a setoff of payment due HCPIII at any time shortly after the deficiency was discovered. However, it apparently chose not to do so. See Compl. at ¶19. Instead, in July 1999, nearly one year after the initial survey, HHS wrote to the North Miami administrator and demanded repayment of the CMP in the total amount of $250,000, a figure representing $10,000 per day for the 25-day gap between August 26, 1998 (when the deficiency was first discovered) and September 20, 1998 (when the AHCA resurvey confirmed substantial compliance). See Compl. Ex. 9. The letter explained that if the CMP was not paid by July 30, 1999, then the penalty would be deducted with interest from the amount then owing to the facility. Id.

North Miami, through its lawyer, responded to the HHS letter on July 9, 1999. See Compl. Ex. 10. The facility argued that, because it previously "alleged substantial compliance on September 3, 1998, by way of the [POC]," it should not be responsible for the CMP through September 20, 1998. See id. Thus, North Miami agreed to pay a total penalty amount of $80,000 --- that is, $10,000 per day from August 26, 1998 to September 2, 1998. See id. HHS replied by letter on August 11, 1999, explaining that:

> For purposes of establishing the period of accrual of a civil money penalty, HCFA does not accept the unverified statements as the date substantial compliance was actually [*sic*]. (See, 42 CFR section 488.454(d). In this case, the State Agency's revisit of September 20, 1998, is the date compliance was verified. Therefore, HCFA is not in a position to find the facility was in compliance prior to the date of the revisit. See, 42 U.S.C. section 1396r(h)(6); 42 CFR section 488.330(a)(1)(D).

<u>See</u> Compl. Ex. 11.

HHS also explained that it had authority to settle the CMP before the time for an administrative appeal expired (which had already occurred), or during the pendency of an appeal, however, no appeal was requested. Nor had North Miami waived its right to a hearing, which would have entitled it to the 35% reduction in the amount of the CMP. <u>Id.</u> Accordingly, HHS concluded that the total amount of the CMP was due and payable. Counsel for North Miami responded with correspondence stating that it was AHCA's function to determine when substantial compliance was reached, so he asked that AHCA reconsider the date of compliance. <u>See</u> Compl. Ex. 12. This is, apparently, where North Miami and HHS left the matter; the facility continued to provide and be reimbursed for Medicare services, and HHS made no attempt to collect the CMP. <u>See</u> Compl. at ¶21.

On February 2, 2000, IHS and its subsidiaries (including HCPIII) filed a petition for bankruptcy under Chapter 11. <u>See</u> Compl. at ¶22. CMS learned of this filing and, on June 9, 2000, informed the administrator for North Miami that it was referring the CMP to the Department of Justice for collection in the bankruptcy action. <u>Id.</u> During the pendency of the bankruptcy proceedings, CMS placed some of the amounts due to IHS facilities into an "administrative freeze," and paid certain other amounts under stipulation. <u>Id.</u> However, CMS did not file a claim for the penalty with the bankruptcy court. <u>Id.</u> at ¶23.

In or about April 2001, HCPIII informed the landowner, Skyler, that it could no longer operate the facility or pay rent. See Compl. at ¶26. Plaintiff asserts that there was "no other operator able to take over the facility operation" and, therefore, it took over North Miami and its provider agreement. Id. In other words, by operation of law, Skyler became the owner of HCPIII's provider agreement and Provider No. 10-5502. Plaintiff impliedly recognizes that it could have rejected the assignment; however, it maintains there was no practical way for it to continue providing nursing services to the residents during the "indefinite period" of time that it would have taken to apply for and receive a new provider agreement. Id.

On October 4, 2001, CMS wrote to the new Delta administrator and advised that "[w]hen there is a change of ownership, the Medicare agreement between [HHS] and the former owner is automatically assigned to the new owner, who is subject to all the terms and conditions of the provider agreement." See Compl. Ex. 15. The letter indicated that the "terms and conditions" included correcting deficiencies previously cited and complying with applicable health and safety requirements. However, there was no mention made that Delta would be responsible for the outstanding CMP. Id. In fact, CMS may not have known of the CMP at that time given that AHCA approved Plaintiff's renewal license two months later, on December 31, 2001, and represented that Delta did not have any outstanding Medicare fines. See Compl. Ex. 16.

On March 13, 2003, IHS filed an Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan"). See Compl. Ex. 17. Under the terms of the Plan, all "United States claims" (which is specifically defined to include CMPs) were being settled pursuant to the "United States Settlement Agreement." See id. The settlement agreement provided for the payment of approximately $19.1 million to the United States for the outstanding claims. See Compl. at ¶30; see also Compl. Ex. 18. In paragraph D of the preamble to the settlement agreement, it was specifically noted

that CMS had pending CMPs against IHS and its subsidiaries that were contemplated by the agreement. See Compl. at ¶31; see also Compl. Ex. 20. The Bankruptcy Court confirmed the Plan to be effective on September 9, 2003. See Compl. Ex. 19.

Plaintiff has alleged, and at this stage of the proceedings I must accept as true, that the settlement agreement between the United States government and IHS was intended to resolve all outstanding financial issues and liabilities between the parties, including CMPs. See generally Compl. at ¶¶31-37. Nonetheless, approximately three and one half years after Plaintiff took over the facility from HCPIII, on November 18, 2004, CMS wrote to Delta demanding that Delta pay the CMP. See Compl. Ex. 1. This letter is the first notice to Plaintiff that Defendants sought to recover this penalty. See Compl. at ¶39. Nearly six months later, on May 2, 2005, CMS issued a "recoupment notice" to deduct $257,421.88 from Medicare payments owed to Delta; this amount represents the full CMP, plus an additional $7,421.88 in interest. See Compl. Ex. 21. Plaintiff requested an administrative hearing in June 2005, but the request was denied because HCPIII had previously been given the right to a hearing. CMS reasoned that Delta (as successor) was "not entitled to another opportunity to contest the CMP in question." See Compl. Ex. 2. This lawsuit followed.

B. Procedural History and Current Allegations

Plaintiff filed a four-count Complaint for declaratory relief in November 2005, asserting that the CMP could not be recovered from Delta because the recoupment (i) was tantamount to an unauthorized penalty; (ii) violated due process; (iii) fell outside the statute of limitations; and (iv) was barred by waiver, accord and satisfaction, and "preclusive court judgment." Defendants moved to dismiss or for summary judgment. While the motion was pending, Plaintiff filed an "Amended Complaint for Declaratory Relief and Relief Under the Freedom of Information Act." Plaintiff contends there is jurisdiction over the Amended Complaint pursuant to 5 U.S.C. §§ 702 and 704 (the

Administrative Procedures Act); 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. §1346 (federal defendant jurisdiction); 28 U.S.C. § 1651 (the All Writs Act); 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act).[4]

In its Amended Complaint, Plaintiff raises eight causes of action. Plaintiff argues that collecting the CMP from Delta constitutes a penalty unauthorized by law (Count I); it violates due process and protection against excessive fine (Count II); it is barred by statute of limitations (Count III); it is barred by waiver (Count IV); it is barred by accord and satisfaction (Count V); it is barred by "preclusive court judgment" (Count VI); it is unlawful insofar as the facility was in compliance for part of the challenged period (Count VII); and it is improper to assess the CMP without affording Plaintiff an administrative hearing (Count VIII). In short, Plaintiff contends that CMS could have collected the CMP from HCPIII before the bankruptcy action; or it could have pursued collection under the surety bond; or it could have filed an appropriate claim with (and negotiated a different settlement in) the bankruptcy court. Because it did none of those things, however, Plaintiff argues that recoupment of the CMP from Delta is improper.

Defendants have moved to dismiss the Complaint on the grounds that there is no federal jurisdiction over the claims. Even if there is federal jurisdiction, Defendants contend this lawsuit should have been filed in the Eleventh Circuit Court of Appeals. As an additional argument, Defendants maintain that, in any event, recouping the CMP is permissible under the doctrine of successor liability. As will be discussed *infra*, this additional argument would appear to only apply, if at all, to Counts I, II and VIII.

III.   **DISCUSSION**

A. Plaintiff's Request for Oral Argument

---

[4]The Complaint is seemingly mistitled as nowhere in the pleading does Plaintiff seek relief under the Freedom of Information Act.

Plaintiff has requested oral argument on Defendants' motion, suggesting that a hearing might help the Court resolve the complex issues presented in this case. The Medicare Act is complex, to be sure. Indeed, it has been said the various statutes and regulations governing Medicare are "among the most completely impenetrable texts within human experience." Rehabilitation Ass'n of Virginia, Inc. v. Kozlowski, 42 F.3d 1444, 1450 (4th Cir. 1994); see also McCreary v. Offner, 1 F. Supp. 2d 32 (D.D.C. 1998) (observing that cases arising under the Medicare Act require "'dense reading of the most tortuous kind'" and paint a "grim jurisprudential picture") (quoting Kozlowski, supra, 42 F.3d at 1450). Nevertheless, on the facts of this particular case, I am able to navigate through the Medicare thicket and decide Defendants' motion without an oral argument. Plaintiff's request for oral argument (Doc. 30) is, therefore, DENIED.

B. Defendants' Motion to Dismiss

Defendants have raised two grounds in their motion to dismiss. The first ground involves a jurisdictional challenge, whereas the second involves a more merit-based challenge. Both will be discussed in turn below.

1. *Does this Court have jurisdiction over Plaintiff's Complaint?*

Before initiating a civil action to recover on a claim arising under the Medicare Act, a plaintiff must comply with the provisions as set forth in 42 U.S.C. §§ 405(g) and (h). The Supreme Court of the United States has held that sections 405(g) and (h) constitute the "sole avenue" for judicial review of a claim arising under the Medicare Act. See generally Heckler v. Ringer, 466 U.S. 602, 614-15, 104 S. Ct. 2013, 80 L. Ed. 2d 622 (1984). These provisions channel the claim through HHS's administrative apparatus, thus allowing the agency a "greater opportunity to apply, interpret, or revise policies, regulations, or statutes" without premature judicial interference. See Illinois Council, supra, 529 U.S. at 13. Section 405(g), therefore, provides for federal

court review of HHS's final agency decision *after* a hearing, and section 405(h) specifies that the review provisions of section 405(g) are exclusive.

Defendants' jurisdictional argument is based primarily on 42 U.S.C. § 405(h), incorporated into the Medicare Act by 42 U.S.C. § 1395ii, which provides in full:

> The findings and decision of [HHS] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of [HHS] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States, [HHS], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.*

Although the statute only refers to "individuals," it also applies to service providers, such as Plaintiff. See Good Samaritan Med. Center v. Secretary of Health and Human Services, 776 F.2d 594, 597 n.6 (6th Cir. 1985). Furthermore, while section 405(h) on its face only bars claims brought pursuant to 28 U.S.C. §§ 1331 and 1346, in fact, it reaches far beyond those two provisions. See Illinois Council, *supra*, 529 U.S. at 1; see also John Aloysius Cogan, Rodney A. Johnson, *Administrative Channeling Under the Medicare Act Clarified: Illinois Council, Section 405(h), and the Application of Congressional Intent*, 9 Annals Health L. 125, 127-28 (2000) (observing that, based on United States Supreme Court precedent and Congressional intent, section 405(h) is intended to have "exceptionally broad" sweep and act as a jurisdictional bar to *any* claim "arising under" the Medicare program; further noting that a medical provider may avoid the administrative exhaustion only "under rare circumstances"). In other words, if the jurisdictional bar contained in section 405(h) applies here, it may well preclude all of Plaintiff's claims, not only those asserted under 28 U.S.C. §§1331 and 1346. The question, therefore, is whether the statute applies, or whether this case presents a "rare circumstance" where administrative exhaustion is not required. This question

can be answered only after a brief review of the four major United States Supreme Court cases interpreting section 405(h), and their progeny.

The first major Supreme Court case to analyze section 405(h) was Weinberger v. Salfi, 422 U.S. 749, 95 S. Ct. 2457, 45 L. Ed. 2d 522 (1975), a suit arising under the Social Security Act ("SSA").[5] In Salfi, a widow and her minor stepson challenged the constitutionality of an SSA provision that required a relationship with a deceased wage earner of at least nine months before survivor benefits could be paid. The district court held that it had jurisdiction under 28 U.S.C. § 1331 on the ground that section 405(h) was just a codification of the judicial doctrine of administrative exhaustion. The district court further held that exhaustion, on the facts of the case, would be futile and so it waived the requirement. The Supreme Court reversed, concluding that the district court's reading of section 405(h) was "entirely too narrow." Id. at 757. The Supreme Court held a "final decision" of the Secretary is a statutory *jurisdictional* requirement:

> That the third sentence of s 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that no action shall be brought under s 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted.

Id. As for the constitutional challenge, the Supreme Court found that although the claim did "arise under the Constitution," it was "fruitless to argue that [it did] not also arise under the [SSA]." See id. at 760. Because it was the SSA that gave plaintiffs the benefits they sought to recover, as well as the standing and the substantive basis for

---

[5]The Medicare Act was established under Title XVIII of the Social Security Act and, accordingly, the jurisdictional issues discussed in Salfi are relevant to this case. See, e.g., Cambridge Hospital Ass'n, Inc. v. Bowen, 629 F. Supp. 612, 616 (D. Minn. 1986) ("Because the Social Security Act and Medicare Act share a high degree of schematic similitude, many courts have stated that cases construing the former are of precedential value in interpreting the latter.")

their constitutional contentions, the suit clearly "arose under" the SSA and, therefore, section 405(h) precluded the claim. Id. at 760-61.

The Supreme Court reaffirmed Salfi nearly a decade later in Ringer, *supra*, 466 U.S. at 602, and extended its holding to claims arising under the Medicare Act. There, four Medicare beneficiaries brought a section 1331 lawsuit in which they challenged HHS's decision not to offer reimbursement for a particular medical procedure. The plaintiffs' complaint alleged violations under both the Administrative Procedures Act and the Due Process Clause of the Fifth Amendment, and it sought declaratory and injunctive relief. The Court once again held that in the absence of administrative exhaustion, section 405(h) barred section 1331 jurisdiction, even though the plaintiffs in that case sought a declaration that HHS's decision was improper, rather than an order requiring payment. Relying on Salfi, the Supreme Court interpreted the "'claim arising under' language quite broadly to include any claims in which 'both the standing and substantive basis for the presentation' of the claims is the [SSA]." Id. at 615. The Court concluded that:

> The third sentence of 42 U.S.C. § 405(h), made applicable to the Medicare Act by 42 U.S.C. § 1395ii, provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all "claim[s] arising under" the Medicare Act. Thus, to be true to the language of the statute, the inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim "arises under" the Act, not whether it lends itself to a "substantive" rather than "procedural" label.

Id. at 614-15 (citations omitted; brackets in original). In other words, the Court held the plaintiffs' allegations were "inextricably intertwined" with their claims that arose under the Medicare program. Accordingly, the claims were justiciable only under and pursuant to the Medicare Act, regardless of whether they were alleging violations of the Constitution and/or the Administrative Procedures Act, or were seeking declaratory

and injunctive relief.

The next major case decided by the Supreme Court on this issue, and one with specific relevance here, was Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 106 S. Ct. 2133, 90 L. Ed. 2d 623 (1986). Michigan Academy involved a challenge by a group of physicians to the validity of a specific Medicare regulation that authorized payments under Part B in different amounts for similar services. At the time the case was decided, the Medicare program did not allow for judicial review of Part B "amount determinations." The Supreme Court recognized that there was a "strong presumption" in favor of judicial review of administrative action, a presumption which could be overcome only by "specific language" or congressional intent. After analyzing the statute as a whole, the Court determined that Congress intended to "bar judicial review only of determinations of the amount of benefits to be awarded under Part B," *not* other matters such as "challenges to the validity of the Secretary's instructions and regulations." See id. at 678-80. This holding, known as the "Michigan Academy exception," was watered down somewhat when Congress subsequently amended the Medicare Act to permit administrative hearings and judicial review of Medicare Part B claims in the same manner as Part A claims. See, e.g., United States v. Blue Cross and Blue Shield of Alabama, Inc., 156 F.3d 1098, 1109 n. 22 (11th Cir. 1998) (observing that "the 1986 amendments to the Medicare Act made Part B claims reviewable to the same extent as Part A claims" and, therefore, "extinguished the 'amount/methodology distinction established in [Bowen v.] Michigan Academy.'") (citation omitted).

The Michigan Academy exception was regarded as a dead letter, and treated as such by most courts, until Illinois Council, *supra*. In that case, the Seventh Circuit had held the Michigan Academy exception "significantly modified" both Salfi and Ringer, limiting those cases to claims for *reimbursement* (*i.e.*, amount determinations), thereby allowing a pre-exhausted challenge to certain Medicare regulations. The

Supreme Court disagreed, holding:

> . . . [W]e cannot distinguish <u>Salfi</u> and <u>Ringer</u> from the case before us. Those cases themselves foreclose distinctions based upon the "potential future" versus the "actual present" nature of the claim, the "general legal" versus the "fact-specific" nature of the challenge, the "collateral" versus "noncollateral" nature of the issues, or the "declaratory" versus "injunctive" nature of the relief sought. Nor can we accept a distinction that limits the scope of § 405(h) to claims for monetary benefits. Claims for money, claims for other benefits, claims of program eligibility, and claims that contest a sanction or remedy may all similarly rest upon individual fact-related circumstances, may all similarly involve the application, interpretation, or constitutionality of interrelated regulations or statutory provisions. There is no reason to distinguish among them in terms of the language or in terms of the purposes of § 405(h). Section 1395ii's blanket incorporation of that provision into the Medicare Act as a whole certainly contains no such distinction. Nor for similar reasons can we here limit those provisions to claims that involve "amounts."

<u>Illinois Council</u>, *supra*, 529 U.S. at 13-14. With this decision, the Court emphatically reaffirmed the principle that "*virtually all legal attacks*" arising under the Medicare Act must be channeled through HHS before judicial review may be available. <u>See</u> <u>id.</u> at 13 (emphasis added). This principle applies even though HHS might not be able to grant the remedy sought. <u>Id.</u> at 23 ("The fact that the agency might not provide a hearing for that *particular contention*, or may lack the power to provide one, . . . is beside the point because it is the 'action' arising under the Medicare Act that must be channeled through the agency.") (emphasis added; citations omitted). In distinguishing <u>Michigan Academy</u>, the Supreme Court stated that it was "more plausible to read [that decision] as holding that § 1395ii does not apply § 405(h) where application of § 405(h) would not simply channel review through the agency, but would mean no review at all." <u>See</u>

id. at 19.

Although the foregoing Supreme Court case law offers important and necessary background, these decisions do not directly answer the somewhat unique jurisdictional question *sub judice*. Here, because the Medicare Act provides "both the standing and substantive basis for the presentation" of Plaintiff's claims, Ringer, 466 U.S. at 615, it is clear that this lawsuit "arises under" the Medicare program. It is likewise clear that Plaintiff did not administratively challenge the CMP. However, there is a reason for its failure to do so: *Plaintiff was not in any way involved at the time*. Indeed, Delta did not assume control of the facility and take over Medicare Provider No. 10-5502 until in or about April 2001, more than two years after the CMP could have been challenged at the administrative level. Undaunted, Defendants argue that North Miami and/or HCPIII had the opportunity to administratively exhaust the CMP, and this should be imputed to Plaintiff, given that Plaintiff, in a manner of speaking, "stepped into HCPIII's shoes." Although Defendants are generally correct that Plaintiff assumed liability for the CMP by operation of law when it took control over the facility, see section III.B.2 *infra*, that does not mean that Plaintiff is *jurisdictionally* barred from pursuing its claims here. This is particularly so for the causes of action that presented themselves only after the time for exhaustion expired, such as statute of limitations, waiver, accord and satisfaction, and preclusive court judgment. Although there is not much case law on this specific issue, two Circuit Courts of Appeal have considered the issue post-Illinois Council and have rejected Defendants' position --- one case did so expressly, the other impliedly.

In Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100 (8th Cir. 2000), *cert. denied*, 534 U.S. 992, 122 S. Ct. 454, 151 L. Ed. 2d 375 (2001), the Eighth Circuit confronted this issue head-on. The plaintiff in that case took over the operation of an SNF from another operator and assumed the latter's provider agreement and number.

The prior operator had incurred CMPs which were unpaid at the time of the change in ownership. The government later tried to collect against the new owner, and the new owner filed a lawsuit asserting claims under the Constitution and the Administrative Procedures Act. The government moved to dismiss the complaint, arguing that under Illinois Council the plaintiff was required to administratively challenge the CMP before filing any civil action. Inasmuch as the plaintiff failed to "seek agency review," the government argued that the district court was deprived of jurisdiction. In rejecting this argument, the Eighth Circuit held:

> [I]n this litigation Deerbrook is not contesting whether the prior operator's conduct warranted a CMP, or that the amount of the CMP was incorrectly assessed. Rather, Deerbrook is contesting whether it is liable for a prior operator's CMP. These are two separate issues. It is questionable whether Deerbrook even had the standing (or the incentive) to intervene in contesting the imposition of CMPs on its predecessor. *Therefore, the district court had jurisdiction to hear the case*.

Id. at 1103 (emphasis added).

The Sixth Circuit Court of Appeals also considered this issue in BP Care, Inc., *supra*, 398 F.3d at 503. In that case, as in Deerbrook Pavilion, LLC, HHS challenged federal district court jurisdiction over a claim involving successor liability for a CMP. The Sixth Circuit concluded that there was no jurisdiction because the plaintiff there did not administratively present its claims to HHS before filing suit; however, the facts of that case differ in significant respects from the ones presented here. In Deerbrook Pavilion, LLC, the new owner assumed control of the SNF --- and assumed the provider agreement and number --- at or around the same general time that the CMP was being imposed on and challenged by the previous owner. In fact, the new owner had actually been served with the notices and motions as they were filed in the CMP proceedings. The new owner, therefore, was an "affected party" under the regulations that *could*

have intervened in the CMP proceedings and presented its claims and defenses at the administrative level. Because it did not do so, the jurisdictional bar in section 405(h) precluded the lawsuit. See id. at 509-14.

Importantly, the Sixth Circuit explained in a footnote in BP Care, Inc. that it was specifically *not* deciding the issue presented in our case: that is, whether a new owner may be jurisdictionally barred from challenging a CMP when the owner assumed the provider agreement and number only *after* administrative remedies are, or could have been, fully exhausted. See BP Care, Inc., *supra*, 398 F.3d at 514 n.9. The rest of the opinion, however, indicates that the court believed jurisdiction would be appropriate in such a situation. For example, the Sixth Circuit recognized that a new owner would "arguably not be a party" with standing to challenge a CMP if it "did not know that it was 'affected.'" See id. at 514. Obviously, on the facts of this case, Plaintiff did not know that it was an "affected" party --- and it would have had no reason to intervene in the CMP proceedings --- years before it assumed ownership of the facility. Further, the Sixth Circuit explained in BP Care, Inc. that the still viable, albeit sharply limited, Michigan Academy exception permits jurisdiction where application of section 405(h) "would effectively mean 'no review at all.'" See id. at 509, 511-12 (*quoting* Illinois Council, 529 U.S. at 19). "No review at all" may arise in one of three scenarios: (i) if the agency could not consider the subject matter of the challenge; (ii) if the new owner were not a party to the administrative proceedings and lacked standing to intervene; or (iii) if the procedural posture of the administrative proceedings made it "impossible" for the new owner to appeal the CMP. See id. at 511-12. Both (ii) and (iii) are clearly present here.

I find that the reasoning of both the Eighth and Sixth Circuits is consistent with the plain language of the statutes and the applicable interpretations by the Supreme Court of the United States. It also comports with well established principles of fairness

and due process --- and common sense. Therefore, I conclude the jurisdictional bar in section 405(h) does not apply to the facts of this case, and, accordingly, this Court has jurisdiction over the Complaint. Because jurisdiction is proper in this Court, I need not consider Defendants' alternative argument that jurisdiction is proper in the Eleventh Circuit Court of Appeals.

> **2. *Does successor liability preclude certain of Plaintiff's causes of action?***

In addition to its jurisdictional argument, Defendants argue that Plaintiff is liable for the CMP because it "failed to take advantage of its prior opportunity to ensure that this CMP was resolved." Defendants thus argue that the doctrine of successor liability renders Plaintiff liable for the CMP, and that the failure to grant Plaintiff an opportunity to contest the CMP at a hearing does not violate due process. Although not specifically delineated by Defendants as such, this secondary argument can apply only to Counts I (unauthorized penalty), II (due process), and VIII (request for administrative hearing), and, as limited to those counts, I agree with Defendants.

At the outset, Plaintiff correctly observes that neither the Medicare Act nor the regulations directly mention successor liability for CMPs. See BP Care, Inc., *supra*, 398 F.3d at 506 n.1.[6] The regulations do explain, however, that "a facility may not avoid a remedy on the basis that it underwent a change of ownership." See 42 C.F.R. § 488.414(d)(3)(i). Furthermore, as previously noted, the regulations state that when a

---

[6]Inasmuch as there is a question of whether successor liability is justified under the current regulations, HHS has explained in implementing the regulations, and has announced in the Federal Register on more than one occasion, that it intends to amend the regulations to clarify that "all Medicare penalties and sanctions are automatically assigned to the new owner unless otherwise stated in the change of ownership." See 60 Fed. Reg. 60,043 (Nov. 28, 1995); see also Lora L. Hock, *Successor Liability in Asset Purchases of Bankrupt Health Care Providers*, 19 Bankr. Dev. J. 179, 192 n.56 (2002). To date, HHS has not yet amended the regulations, but as discussed herein, further clarification is badly needed.

provider agreement is transferred the agreement "is subject to all applicable statutes and regulations and to the terms and conditions under which it was originally issued including, *but not limited to*, [certain terms and conditions not relevant here]." See 42 C.F.R. § 489.18(d) (emphasis added). Beginning with the Fifth Circuit's decision in United States v. Vernon Home Health, Inc., 21 F.3d 693 (5th Cir. 1994) courts have *uniformly* interpreted the above regulations to apply to and justify successor liability for CMPs, meaning that the new owner who assumes an existing provider agreement and number instead of applying for a new one will be responsible for the prior owner's liabilities. See id. at 696 (holding that "[b]y accepting [assignment of the prior owner's agreement], Vernon II agreed (albeit unknowingly) to accept the terms and conditions of the regulatory scheme," including successor liability for overpayments); Deerbrook Pavilion, LLC v. Shalala, 235 F.3d 1100, 1103-05 (8th Cir. 2000) (expressly rejecting a due process challenge to CMP successor liability claim; holding that when a provider agreement is assigned away to a new owner, the facility is purchased "as is" and the penalty "carries over to the subsequent owner"); see also BP Care, Inc. v. Thompson, 337 F. Supp. 2d 1021, 1028-30 (S.D. Ohio 2003) (holding a "new operator is not required to assume the provider agreement of the former operator;" however, once it does so, the new owner will be charged with and responsible for all liabilities "because a facility is purchased 'as is'").[7] At least one state appellate court has considered this issue and reached the same result. See generally Cedar Hill Manor, LLC v. Dep't of Social Serv., 145 S.W.3d 447 (Mo. App. 2004) (rejecting a due process challenge

---

[7]While it does not constitute a holding, the Third Circuit Court of Appeals, in an unpublished opinion, has also recognized that a new owner is liable for pending CMPs whenever a provider agreement is assigned. See In re Charter Behavioral Health Sys., LLC, 45 Fed. Appx. 150, 151 n.1 (3d Cir. 2002) ("If the new owner elects to take an assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments and [CMPs] asserted by the Government against the previous owner") (citations omitted).

where liability for a CMP was imposed on a subsequent owner "thrice removed" from the violator and more than four years after the violation).[8]

The justification and policy rationales for CMP successor liability, as imposed in the above cases, appears to be three-fold. First, "collection of CMPs from successors allows the replenishment of the Medicare trust funds when a previous owner dissolves or otherwise becomes judgment-proof." See Deerbrook Pavilion, LLC, supra, 235 F.3d at 1104. This situation is present to some extent in this case. Furthermore, successor liability for CMPs and other existing debts is used as a means "to curb fraud and sham transactions in the nursing home industry." See id. (citations omitted); accord Cedar Hill Manor, LLC, supra, 145 S.W.3d at 447, wherein the court stated:

> It is probably good policy to impose successor liability in cases such as this one. Imposing successor liability might dissuade some would-be assignees from taking over nursing homes that owe Penalties, [however,] it is probable that to allow avoidance of final Penalties by assigning the license would be to encourage transfers from the sole underlying purpose to avoid payments of a valid government sanction.

Plaintiff states that it "has no quarrel with curbing sham transfers;" however, it argues that successor liability "cannot be blindly imposed on all transfers," particularly "good faith" transfers like the one at issue. It appears from this argument that successor liability should be imposed only if the transfer is a sham, or is otherwise in bad faith. Plaintiff is saying, therefore, that it should have an opportunity to challenge successor

---

[8]Numerous administrative DAB decisions have held similarly. See, e.g., Loess Hills Nursing & Rehabilitation Center v. Centers for Medicare & Medicaid Services, Docket Nos. C-01-578, C-01-751, DAB No. CR843, 2001 WL 1688376 (H.H.S.) (Dec. 6, 2001). Indeed, the HHS "State Operations Manual" specifically endorses the policy of successor liability. See generally Centers for Medicare and Medicaid Services, State Operations Manual § 3210E (2004) ("SOM"), attached as Ex. 3 to Defendant's Motion to Dismiss (Doc. 25).

liability, that good faith is an appropriate consideration, and that each case is different. But, successor liability is to be imposed as part of a broad policy effort to *deter* sham transfers; it is not imposed only where there *is* a sham transfer. To be sure, in some of the cases where successor liability has been imposed, there was no suggestion that the underlying assignment was a sham or otherwise in bad faith. See, e.g., Deerbrook Pavilion, LLC, *supra*, 235 F.3d at 1100; Vernon Home Health, Inc., *supra*, 21 F.3d at 693; BP Care, Inc., *supra*, 337 F. Supp. 2d at 1021; accord Cedar Hill Manor, LLC, *supra*, 145 S.W.3d at 447.

The third justification for successor liability, and its applicability here, requires a little more detailed analysis. Successor liability has also been justified on the grounds that the new owner(s) assumed responsibility for all existing liabilities in exchange for receiving uninterrupted Medicare payments. Cf. Raintree Healthcare Corp., *supra*, 431 F.3d at 689 (recognizing that successor liability has been imposed as a "quid pro quo" for new owners being able to receive the payments under Medicare "immediately upon starting its operations"). If the new owner wants to avoid entirely the threat of liability, it can refuse the assignment and enter a new provider agreement, see Vernon Home Health, Inc., *supra*, 21 F.3d at 696, or it can perform its "due diligence" prior to the sale to ensure that there are no outstanding CMPs. See Deerbrook Pavilion, LLC, *supra*, 235 F.3d at 1104-105; Cedar Hill Manor, LLC, *supra*, 145 S.W.3d at 454. If CMPs are discovered during the due diligence, the new owner is faced with a choice: it can either negotiate a lower purchase price to offset the CMP, see Deerbrook Pavilion, LLC, *supra*, 235 F.3d at 1104-105, or it can refuse the assignment, seek new certification, and, once approved, enter into a new provider agreement. Although the provider will be unable to offer its Medicare services and/or receive payment while the certification process is in progress, "it is possible that the amount of money lost by this hiatus in Medicare payments could be more than offset by avoiding responsibility

for [liabilities] incurred by previous owners." <u>See</u> HCFA Memorandum on Commerce Clearinghouse Report of Court Ruling Regarding Transfer of Provider Agreement, to Spencer Ericson, Associate Regional Administrator, Division of Health Standards and Quality, Region VIII, December 29, 1994, *attached to* Paul R. DeMuro and Esther R. Scherb, *Steering Around Successor Liability in Health Care Transactions*, 1129 PLI/Corp 23 (1999).

The foregoing clearly makes sense when the transfer is part of an ordinary arm's length "purchase transaction." In such a situation, the purchaser is deriving a financial benefit from buying the facility and receiving uninterrupted Medicare payments, and it is only reasonable to expect that it bear the risk that there are outstanding liabilities that could have, and should have, been discovered and negotiated during the purchase transaction. But, does the same rationale apply where, as is alleged here, a new owner altruistically assumes the provider agreement in order to avoid disruption in service to nursing home residents when the facility is about to shut down? Is there room in the rule of successor liability for some humanitarian exception?

First, I begin with the controlling regulation itself. According to the unambiguous language of 42 C.F.R. § 489.18(c), a provider agreement is "automatically" transferred to the new owner when there is a change of ownership; the new owner is then subject to the terms and conditions of the agreement. A change of ownership will occur in one of several possible situations, depending on whether the facility is a partnership, a sole proprietorship, or a corporation. Significantly, this particular regulation --- which is the principal basis for successor liability --- applies *whenever* there is change of ownership, which includes *any* transfer of title. Stated another way, this regulation is not limited (and thus successor liability is not limited) solely to purchase transactions. Instead, the regulation applies whenever there is a transfer of title, regardless of the reason for the transfer.

Moreover, 42 C.F.R. § 488.414(d)(3)(i) provides that "a facility may not avoid a remedy on the basis that it underwent a change of ownership." It says nothing about making an exception for a facility that undergoes change of ownership solely to avoid a disruption of services to residents. Indeed, such an exception would swallow the rule for new owners *always* want to avoid disruption in service. This is because, at bottom, any disruption will always have a negative financial impact upon the operator. Plaintiff recognizes the interrelationship between services and revenue when it concedes that it assumed the provider agreement specifically so that it could "avoid disruption in the *payment for services* to residents, which was essential to the *continuity of care* for the residents." See Compl. at ¶26 (emphasis added).

In addition, CMS has made clear on the Federal Register and in various agency memoranda that successor liability --- as first established in Vernon Home Health, Inc. --- represents its national policy. See generally Guenthner, *supra*, 16 Health Law at 1; Groves, *supra*, 14 Health Law at 15; Hock, *supra*, 19 Bankr. Dev. J. at 179; DeMuro and Scherb, *supra*, 1129 PLI/Corp at 23. Indeed, CMS clarified in its State Operations Manual that the regulations provide that when a new owner accepts the assignment of an existing provider agreement, it is subject to the exact same terms and conditions that applied to the previous owner, which includes liability for outstanding "sanctions and penalties." See SOM at 3210. As a general matter, a court must give "substantial deference" to an agency's interpretation of its own regulations. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). It is not my task "to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S. Ct. 2381, 129 L. Ed. 2d 405 (1994). Here, CMS's interpretation of the controlling regulations,

as reflected in the State Operations Manual and agency memoranda, is neither plainly erroneous nor inconsistent with the regulations themselves. Indeed, the courts which have considered challenges to successor liability have upheld the policy on the basis of the regulations. See generally Deerbrook Pavilion, LLC, *supra*, 235 F.3d at 1100; Vernon Home Health, Inc., *supra*, 21 F.3d at 693; BP Care, Inc., *supra*, 337 F. Supp. 2d at 1021; accord Cedar Hill Manor, LLC, *supra*, 145 S.W.3d at 447.

As noted, multiple cases have upheld successor liability for CMPs. Plaintiff has filed a 23-page memorandum of law in opposition to Defendants' Motion to Dismiss, in which it has cited approximately 40 cases in support of its arguments. However, it has not cited a *single case* in which a court has rejected successor liability for CMPs, and my own research has uncovered none. Instead, it appears Plaintiff simply believes that --- despite the case law and policies behind it --- it is not fair to impose liability on an "innocent party." Plaintiff argues that this is particularly so when the new owner, like Delta, has no choice and is forced to assume the provider agreement. Although I am sympathetic to Plaintiff's fairness argument, the principle of successor liability is well established and widely recognized. At the risk being redundant, it bears repeating that Plaintiff did have a choice: not to accept assignment of the provider agreement. It was perhaps a *difficult* choice, given that the residents would have been forced out on short notice and the facility shut down for an indefinite period, but the regulations and case law on this issue do not provide any leeway to accommodate the residents' needs.

The DAB administrative decision in Loess Hills Nursing & Rehabilitation Center v. Centers for Medicare & Medicaid Services, Docket Nos. C-01-578, C-01-751, DAB No. CR843, 2001 WL 1688376 (H.H.S.) (Dec. 6, 2001), a case similar to this one in many important respects, is illustrative. The petitioner there owned real property which it leased to TLC, the operator of an SNF. Under the terms of the lease agreement, the

petitioner had authority to assume control of the land and operate the facility under its existing provider agreement if TLC terminated or defaulted on the lease. During two inspections in March 2001, CMS uncovered various deficiencies and imposed a CMP. TLC then abandoned the operation, after which the petitioner assumed control of the facility due to "the emergency caused by TLC's sudden abandonment of it." In total, the petitioner operated the facility for a mere 9 days. CMS eventually sought to collect the CMP from the petitioner, and DAB held this was permissible. In rejecting the exact same argument Plaintiff advances here, DAB determined that the "emergency caused" by TLC's abandonment

> is not a reason to conclude that Petitioner is exempt from liability for any remedies that CMS determined to impose. Petitioner voluntarily accepted assignment of the facility and its provider agreement. Petitioner was under no obligation to do so. Presumably, there were some financial incentives that inured to Petitioner's benefit that gave Petitioner a reason for accepting assignment of the facility and the provider agreement. But, regardless, by agreeing to accept assignment Petitioner became liable under 42 C.F.R. § 489.18(d).

Notably, the petitioner in Loess Hills Nursing & Rehabilitation Center argued that there is a difference between an arm's length transaction involving the sale of assets, and a situation where a new owner assumes ownership of a facility in an "emergency" situation in order to provide continuing care to the nursing home residents. DAB flatly rejected the argument, observing that it was unsupported in the law. See id. ("[T]here was no requirement --- even in the event of default --- that Iowa N.H. take assignment of TLC's provider agreement. Iowa N.H. or Petitioner could have elected to close the facility and to apply for a new provider agreement in Petitioner's name.").[9]

---

[9]I recognize that the facts of Loess Hills Nursing & Rehabilitation Center differ
(continued...)

In sum, it appears well established that the new owner who assumes an existing provider agreement has successor liability for unresolved CMPs, and to impose liability for CMPs does not constitute a violation of due process. This has been accepted at the agency operations level; at the DAB administrative level; and in every reported judicial decision that has considered the matter. In the absence of any contrary authority from the Eleventh Circuit or elsewhere, I reluctantly accept this principle.

There remains the somewhat separate question of whether Plaintiff is entitled to a hearing before the penalty is collected, presumably so that Plaintiff may challenge, *inter alia*, the amount of the CMP. Defendants argue that Plaintiff, as the new owner, is not entitled to an administrative hearing that had previously been made available to the former owner. The case law supports Defendants on this question, too. See, e.g., BP Care, Inc., *supra*, 398 F.3d at 513; Cedar Hill Manor, LLC, *supra*, 145 S.W.3d at 453-54; BP Care, Inc., *supra*, 337 F. Supp. 2d at 1028 (rejecting the argument that the new owner there "had no opportunity to participate in administrative review of the

---

[9](...continued)

from the case *sub judice* in one important respect: the deficiencies there continued and "persisted" after the petitioner took over the facility. See 2001 WL 1688376 ("I note that, although Petitioner may not have caused the deficiencies that are the basis for CMS' remedy determination, those deficiencies persisted *after* Petitioner accepted assignment of the facility and TLC's provider agreement."). Here, the deficiencies were corrected long before Plaintiff took over the facility, and thus Plaintiff never operated the facility with the deficiencies. However, the fact that remedies persisted after the change in ownership in Loess Hills Nursing & Rehabilitation Center was an *additional* (not dispositive) reason for DAB's decision. Indeed, the appeals board there specifically held it was "consistent" with the remedial purpose of the Medicare Act "to conclude that an entity which takes assignment of a facility and operates it pursuant to a predecessor's provider agreement is liable for any remedies that may be based on either its *or its predecessor's* failure to comply with the terms of that agreement. . ." (emphasis added).

Case No.: 3:05-CV-436/RV/EMT

civil money penalty and thus should not be liable to pay it;" even if the "administrative proceedings finished long before [the new owner assumed the] provider agreement, CMS could still collect the civil money penalty").[10]

Importantly, the foregoing analysis does not mean that Plaintiff's claims must all fail. Plaintiff has, in a manner of speaking, "stepped into the shoes" previously worn by HCPIII. Consequently, Plaintiff is entitled to all the claims and defenses that HCPIII would have were CMS attempting to collect the CMP directly from it. On the facts of this case, Plaintiff has a number of different claims and defenses that remain viable. In particular, the "settlement agreement" confirmed by the bankruptcy court may be fully dispositive. As noted in section III.B.1 *supra*, this Court has jurisdiction to hear that cause of action (as well as the other remaining causes of action) and award relief

---

[10]Plaintiff has very recently filed a "Notice of Supplemental Authority," referring this Court to two cases that purportedly support the argument that Plaintiff should be allowed to challenge the CMP at an administrative hearing. Specifically, Plaintiff cites to Crestview Parke Care Center v. Thompson, 373 F.3d 743 (6th Cir. 2004), which, in turn, cites to the DAB decision in CarePlex of Silver Spring v. Health Care Financing Administration, Docket No. A-98-94, DAB No. 1683, 1999 WL 985363 (H.H.S.) (April 13, 1999). Plaintiff's reliance on Crestview Parke Care Center and CarePlex of Silver Spring is misplaced. Those cases confronted the unremarkable situation where a new owner already assumed ownership *at the time* the penalty was imposed, and therefore the new owner had the opportunity to (and in fact did) challenge the CMP at a hearing. Neither case confronted the clearly different situation here, where a new owner seeks an administrative hearing *years after-the-fact*, notwithstanding that the previous owner did not request a hearing back when it had the opportunity. Plaintiff is not entitled to a hearing in such a situation. See BP Care, Inc., *supra*, 337 F. Supp. 2d at 1028; Cedar Hill Manor, LLC, *supra*, 145 S.W.3d at 453-54; Wellington Oaks Care Center v. Health Care Financing Administration, Docket No. C-96-203, DAB No. CR456, 1997 WL 72173 (H.H.S.) (Jan. 28, 1997) (new owner is not entitled to an extension of time to request an administrative hearing; holding that enforcement remedies are imposed upon the *providers*, not upon the *owners*, and thus CMS "need not concern itself with issues between present owners and previous owners" as present owners "cannot be permitted to 'start over again' the orderly process" by which a remedy is enforced).

as may be appropriate.

## IV.   CONCLUSION

For all the reasons stated above, Defendants' Motion to Dismiss (Doc. 25) is GRANTED only as to Counts I, II, and VIII, but DENIED as to Counts III, IV, V, VI, and VII.  Plaintiff's request for oral argument (Doc. 30) is also DENIED.

DONE AND ORDERED this 17th day of October, 2006.

*/s/ Roger Vinson*
**ROGER VINSON**
**Senior United States District Judge**